UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:17-CR-306 JCM (VCF) |
| Plaintiff(s), | ORDER |
| v. | |
| SVYATOSLAV BONDARENKO, et al., | |
| Defendant(s). | |

Presently before the court is the matter of *United States v. Bondarenko et al.*, case number 2:17-cr-00306-JCM-VCF. The following motions are pending:

(1) John Telusma's motion for leave to file reply (ECF No. 562);
(2) Magistrate Judge Peggy A. Leen's report and recommendation (ECF No. 534);
(3) Magistrate Judge Leen's report and recommendation (ECF No. 533);
(4) Magistrate Judge Leen's report and recommendation (ECF No. 529);
(5) Magistrate Judge Leen's report and recommendation (ECF No. 528);
(6) Magistrate Judge Leen's report and recommendation (ECF No. 527);
(7) Magistrate Judge Leen's report and recommendation (ECF No. 525);
(8) Magistrate Judge Leen's report and recommendation (ECF No. 524);
(9) Telusma, Frederick Thomas, Aldo Ymeraj, and Marko Leopard's motion to dismiss (ECF Nos. 476, 533);
(10) Telusma's motion to suppress (ECF No. 475);
(11) Valerian Chiochiu's motion to suppress (ECF No. 474);
(12) Chiochiu's motion to dismiss (ECF No. 473);
(13) Leopard, Telusma, Thomas, Chiochiu, Pius Wilson, and Ymeraj's motion to dismiss (ECF Nos. 471, 525);
(14) Leopard's motion to dismiss (ECF No. 468); and
(15) Thomas' motion to dismiss (ECF No. 467).

. . .

. . .

James C. Mahan
U.S. District Judge

## I.     Background

This prosecution involves the takedown of Infraud Organization, a transnational

cybercrime syndicate consisting of 10,901 members.  (ECF No. 303).  Infraud Organization

operated a website that served as the premier destination to traffic contraband that criminals

recovered through acts of identity theft and financial fraud.  *Id*.  Infraud Organization also used

advertisements on its website to direct illicit activity to its members' automated vending sites,

which were online platforms that transacted stolen personal and financial information.  *Id*.

The purpose of Infraud Organization was to operate an online discussion forum that

provided for the purchase and sale of high-quality contraband.  *Id*.  The forum, which was called

"In fraud" and had the slogan "In Fraud We Trust," provided several safeguards to further the aims

of the syndicate and protect its members from criminal liability.  *Id*.  All members remained

anonymous to each other by interacting solely with usernames and concealed the nature of their

transactions by using digital currencies.  *Id*.  The forum also allowed members to rate vendors as

a means of maintaining the quality of contraband available on the Infraud website.  *Id*.

In the early days of the syndicate, co-founder defendant Svyatoslav Bondarenko

established rules that governed members' conduct on the website.  *Id*.  Infraud Organization

routinely policed the forum for rule-violators such as "rippers," which are vendors of low-quality

illicit goods or vendors that do not deliver goods and services in accordance with the terms of their

transactions.  *Id*.  The enforcement of these rules and the successful operation of the forum required

Infraud Organization to create the following hierarchy:

- Administrators, a.k.a. 4DMini57r470rz, formed the governing council of Infraud

    Organization.  *Id*.  They handled the long-term strategic planning of the syndicate and

    made day-to-day management decisions including but not limited to who can join the

    syndicate, rewards for loyal members, punishments for disloyal members, and

    retaliatory measures against rival criminal organizations.  *Id*.

- Super moderators, a.k.a. Super M0DER470R5, oversaw subject-matter areas on the

    forum that were within their expertise or geographic area.  *Id*.  Super moderators

    would primarily review products, mediate disputes, and edit/delete posts.  *Id*.

- Moderators, a.k.a. M0d3r470r2, had the same responsibilities as super moderators but Infraud Organization limited their authority to moderating one or two specific sub-forums. *Id.*
- Vendors, a.k.a. professors or doctors, sold illicit products and services to members of Infraud Organization. *Id.* Although these transactions often occurred on the vendors' own websites, the vendors would pay Infraud Organization so they could advertise their websites on the forum. *Id.* Vendors also sold products and services directly to customers by using email, private messages on the forum, and instant messaging services. *Id.*
- VIP members, a.k.a. fratello masons or advanced members, are longstanding or otherwise notable members of Infraud Organization. *Id.*
- Members, a.k.a. Phr4Ud573r, are general members of Infraud Organization. *Id.* They would use the forum to gather information about perpetrating criminal activities, solicit other members to engage in criminal schemes, pay for and post advertisements, and traffic contraband. *Id.* Members also relied on moderators or administrators to settle disputes that arose from transactions. *Id.*

Individuals would join Infraud Organization as members by having an administrator grant their request to join the forum. *Id.* After joining the syndicate, members could move up and down the hierarchy. *Id.*

Infraud Organization operated from October 2010 to February 2018 and caused more than $568,000,000.00 in losses. (ECF Nos. 303, 573). Bondarenko and defendant Sergey Medvedev created Infraud Organization shortly after Bondarenko was banned from Carder.su, which was another cybercrime syndicate that operated from November 2005 to January 2012. (ECF Nos. 467, 504). Carder.su and Infraud Organization had similar hierarchy structures, engaged in similar criminal activities, and had over 10,000 members. *Id.* However, Carder.su used a different online forum and had different leadership. *Id.* Due to the anonymity of the conspirators, it is unclear to what extent the memberships of the two syndicates overlapped. *See* (ECF Nos. 504, 510).

Three defendants in this litigation, Thomas, Lirdon Muslie, and John Doe #5, a.k.a. Deputat, were previously indicted in a separate case for their involvement in the Carder.su conspiracy. (ECF No. 504). Thomas joined Infraud Organization several months after the government took down Carder.su. *Id*. He continued to engage in illicit activities on the Infraud website up until November 2014, just one month before a federal court sentenced Thomas to sixty months of custody for his involvement in the Carder.su conspiracy. *Id*.

A fourth defendant, Leopard, is a resident of the Republic of North Macedonia. (ECF Nos. 468, 502). In 2016, a Macedonian court indicted Leopard for the crime of making and using fake payment cards in violation of Macedonia Criminal Code Art. 274-b(2). *Id*. The Macedonian indictment included allegations of cybercrime activities, such as selling stolen information through the website *www.tonymontana.cc*, that the government has also alleged in this case. *See* (ECF Nos. 303, 468-1). Leopard eventually admitted guilt and, on December 13, 2016, the Macedonian court sentenced Leopard to twelve months of imprisonment. (ECF Nos. 468, 468-2). Leopard completed his term of custody on August 25, 2017. (ECF No. 468-3).

A fifth defendant, Chiochiu, joined Infraud Organization in December 2012. (ECF Nos. 473, 503). According to the government, Chiochiu helped other members develop, deploy, and use malware as a means of harvesting data. *Id*. Chiochiu allegedly developed a variant of FastPOS software, which is a program designed to infect computers that handle credit card data and steal financial information. (ECF No. 503). Chiochiu also allegedly shared with other members a programming script that can create automatic vending websites for the sale of fraud-related products. (ECF Nos. 473, 503).

Several defendants, including Thomas, Leopard, Ymeraj and Telusma, were vendors in Infraud Organization. (ECF No. 303). Their alleged activities included operating websites that facilitated illicit activity. Thomas hosted a website that provided a look-up service, which allowed Infraud Organization members to obtain compromised social security numbers and other personal information. *Id*. Leopard, Ymeraj, and Telusma hosted websites that sold compromised credit card data. *Id*. Telusma's website also provided services that allowed Infraud Organization members to launder funds that they illicitly obtained. *Id*.

## II.     Procedural History and Warrants

On September 19, 2017, the government initiated this prosecution.  (ECF No. 1).  The second superseding indictment names thirty-six defendants and asserts nine counts: a single charge for racketeer influenced and corrupt organizations ("RICO") conspiracy in violation of 18 U.S.C. § 1962(d) and eight charges for possession of fifteen or more counterfeit and unauthorized access devices in violation of 18 U.S.C. § 1029(a)(3).  (ECF No. 303).

Throughout the course of litigation, the government searched two premises that are relevant to the court's present inquiry.  The first search was of Chiochiu's residence ("Chiochiu warrant") and the second search was of Telusma's residence ("Telusma warrants").  (ECF Nos. 474, 475).

### A.   Chiochiu warrant

On March 28, 2018, Chiochiu self-surrendered.  (ECF Nos. 363, 474, 501).  During his arrest, Chiochiu provided law enforcement officials with a home address at which he did not actually live.  (ECF No. 474-1).  Chiochiu also turned over three digital devices: two computer hard drives and an iPhone.  *Id*.  Later that day, Chiochiu pleaded not guilty and the court released him on a personal recognizance bond.  (ECF Nos. 358, 360).

Forensic analysis of the devices revealed that, on the day before his arrest, Chiochiu "surgically wiped" the hard drives with a program called "CCleaner" and deleted data on the iPhone by resetting it to factory settings.  (ECF No. 474-1).  Chiochiu attempted to conceal these acts by leaving a large amount of innocuous data, such as personal photos and documents, on the hard drives.  *Id*.  However, one of the hard drives contained artifacts indicating the presence of FastPOS malware and cryptocurrentcy-related software.  *Id*.

While examining these devices, Special Agent Michael Adams concluded that Chiochiu is a sophisticated software developer.  *Id*.  Adams further concluded that Chiochiu retained a body of prior work on other devices because software developers often retain previous code so they can efficiently solve similar problems in the future by making minor adaptations to existing libraries. *Id*.  Adams believed, in his training and experience, that these other devices were in Chiochiu's place of residence.  *Id*

In October 2018, the government discovered that Chiochiu's wife, Irina Calaras, was residing at 68 Borghese, Irvine, California 92618 ("Borghese property"). *Id*. Law enforcement officials surveilled the property and, on October 25, 2018, observed Chiochiu at the residence taking out the trash. *Id*. On November 5, 2018, Magistrate Judge Autumn D. Spaeth of the Central District of California issued a search warrant on the Borghese property and authorized law enforcement officials to seize funds, devices, and instrumentalities related to Chiochiu's trafficking of contraband. *Id*.

Two days later, law enforcement officials executed the search warrant. (ECF Nos. 474, 501). The government found Chiochiu at the residence and arrested him for violating his terms of pretrial release. *Id*. The government also seized cards, cash, and twenty-one digital devices—laptops, tablets, cell phones, and loose hard drives. *Id*.

### B. *Telusma warrants*

On February 5, 2018, Magistrate Judge James Orenstein of the Eastern District of New York issued a search and seizure warrant for Telusma's residence located at 42 Paerdegat 5th Street, Brooklyn, New York ("Brooklyn property"). (ECF No. 475-1). The warrant's affidavit contained significant content of Telusma's role as a vendor in Infraud Organization. *Id*. Telusma primarily provided money laundering services and engaged in carding—purchasing retail items with counterfeit or stolen credit cards. *Id*.

The affidavit also disclosed that the government recovered Telusma's Infraud-registered email account, peterelliot@live.com. *Id*. The account contained emails revealing that Telusma received compromised credit card numbers and that on one occasion he contacted Medvedev with regards to a rule-violator. *Id*. The account revealed that Telusma sent some of these emails with his iPad. *Id*. According to the affidavit, the government also discovered Telusma's Facebook account, which had various posts related to illicit activities that included images depicting his smartphone, iPad, and MacBook Pro. *Id*.

The affiant explained that, in her training and experience, individuals who commit electronic and internet-based crimes possess multiple digital devices. *Id*. The affiant further explained that cybercriminals retain old devices because they are aware that the devices contain

James C. Mahan
U.S. District Judge

contraband and other evidence of criminal activity.  *Id*.  Consistent with the contents of the affidavit, the affiant concluded that Telusma possessed his smarphone, iPad, and MacBook Pro and that the devices were likely located at Telusma's place of residence.  *Id*.

On February 6, 2018, law enforcement officials executed the search warrant for the Brooklyn property.  (ECF Nos. 474, 515).  The agents found Telusma sleeping in a bedroom and observed an iPhone, external hard drive, MacBook Pro, USB thumb drive, and a box filled with white credit card blanks.  (ECF No. 523).  The government immediately obtained a supplemental warrant, which authorized the seizure of the above-referenced items.  *Id*.  On that same day, law enforcement officials returned to the Brooklyn property and seized an iPhone 8, iPhone X, iPad, MacBook Pro, external hard drive, and credit card blanks.  (ECF Nos. 475, 475-1, 515).

On March 13, 2018, Homeland Security Investigations agents in Las Vegas, Nevada received the devices and began examining their contents in April 2018.  (ECF No. 515).  However, the February search warrants did not authorize examination of the devices.  *Id*.  Once the agents discovered this, they ceased their activities and requested a search warrant from Magistrate Judge Carl W. Hoffman of the District of Nevada.  *Id*.  The warrant's affidavit explained the government's mistake and incorporated by reference the February warrants. (ECF Nos. 515-2).  On July 6, 2018, Magistrate Judge Hoffman authorized the search of all five devices.  *Id*.

*C. Pending substantive motions*

Thomas, Leopard, Telusma, Chiochiu, Wilson, and Ymeraj have collectively filed five motions to dismiss the second superseding indictment.  (ECF Nos. 467, 468, 471, 473, 476).  Chiochiu has filed a motion to suppress all items that the government seized during the November 7, 2018, search of the Borghese property for lack of probable cause.  (ECF No. 474).  Lastly, Telusma has filed a motion to suppress (1) his iPhone 8 and iPhone X for lack of probable cause and (2) his iPhone 8, iPhone X, iPad, and MacBook Pro because the search warrant lacks particularity.  (ECF No. 475).  Magistrate Judge Leen recommends denying all seven motions.  (ECF Nos. 524, 525, 527, 528, 529, 533, 534).

. . .

**III.    Legal Standard**

James C. Mahan
U.S. District Judge

This court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). Where a party timely objects to a magistrate judge's report and recommendation, the court is required to "make a de novo determination of those portions of the [report and recommendation] to which objection is made." 28 U.S.C. § 636(b)(1).

Where a party fails to object, however, the court is not required to conduct "any review at all . . . of any issue that is not the subject of an objection." *Thomas v. Arn*, 474 U.S. 140, 149 (1985). Indeed, the Ninth Circuit has recognized that a district court is not required to review a magistrate judge's report and recommendation where no objections have been filed. *See United States v. Reyna-Tapia*, 328 F.3d 1114 (9th Cir. 2003) (disregarding the standard of review employed by the district court when reviewing a report and recommendation to which no objections were made).

**IV.    Discussion**

Thomas, Leopard, Telusma, Chiochiu, Wilson, and Ymeraj have collectively objected to five of Magistrate Judge Leen's report and recommendations (ECF Nos. 524, 525, 528, 533, 534). (ECF Nos. 543, 544, 545, 550, 551). Although Chiochiu has not objected to the magistrate judge's two remaining report and recommendations (ECF Nos. 527, 529) to deny his motion to dismiss (ECF No. 473) and motion to suppress (ECF No. 474), the court will conduct a *de novo* review of all seven motions to determine whether to adopt the magistrate judge's findings. The court will first address the motions to dismiss.

*A.    Motions to dismiss*

Federal Rule of Criminal Procedure 12(b) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). A pretrial motion to dismiss is not the proper vehicle for a summary trial on the evidence. *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002); *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996). Rather, courts adjudicate Rule 12(b) motions only when they involve questions of law. *United States v. Schulman*, 817 F.2d 1355, 1358 (9th Cir. 1987).

In ruling on a pretrial motion to dismiss, "the district court is bound by the four corners of the indictment." *United States v. Lyle*, 742 F.3d 434, 436 (9th Cir. 2014). "If the pretrial claim is substantially founded upon and intertwined with evidence concerning the alleged offense, the motion falls within the province of the ultimate finder of fact and must be deferred." *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986) (quotes and citation omitted). A district court can, however, make preliminary findings of fact necessary to decide questions of law when doing so does not resolve issues properly left to the fact-finder. *Id.*

i. *Thomas' motion to dismiss*

Thomas argues that the court should dismiss the second superseding indictment on two grounds: (1) the government has placed Thomas in double jeopardy because the instant action is the same case as the Carder.su prosecution and (2) this proceeding is a successive prosecution in violation of the Due Process Clause of the Fifth Amendment. (ECF No. 467).

a. *Double jeopardy*

The Double Jeopardy Clause of the Fifth Amendment protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense. *Witte v. United States*, 515 U.S. 389, 395–96 (1995). This clause prohibits the government from splitting a single conspiracy into separate charges and bringing successive prosecutions against a defendant. *United States v. Guzman*, 852 F.2d 1117, 1119–20 (9th Cir. 1988). Courts employ the five-factor *Arnold* test to evaluate double jeopardy claims involving multiple conspiracy charges under the same statute. *Arnold v. United States*, 336 F.2d 347 (9th Cir. 1964).

The *Arnold* test requires courts to consider "(1) the differences in the periods of time covered by the alleged conspiracies; (2) the places where the conspiracies were alleged to occur; (3) the persons charged as coconspirators; (4) the overt acts alleged to have been committed; and (5) the statutes alleged to have been violated." *United States v. Ziskin*, 360 F.3d 934, 944 (9th Cir. 2003) (quoting *United States v. Montgomery*, 150 F.3d 983, 990 (9th Cir. 1998)). The defendant bears the burden of showing that the two conspiracies are indistinguishable in law and in fact. *Id.* at 943 (citing *Montgomery*, 150 F.3d at 990).

The government has not placed Thomas in double jeopardy because Carder.su and Infraud Organization were separate and distinct conspiracies. Carder.su. operated from November 2005 to January 2012 whereas Infraud organization operated from October 2010 to February 2018. (ECF Nos. 467, 504). Had the two conspiracies been one and the same, they would have existed during the same time period. Moreover, Thomas's contention that Infraud Organization was merely a continuation of Carder.su is patently incorrect because the two syndicates had different leadership and their years of operation overlapped for approximately sixteen months. *Id*.

The court recognizes that both Carder.su and Infraud Organization had over 10,000 members. *Id*. However, this fact is unhelpful because the anonymity of the conspirators makes it all but impossible to determine to what extent the memberships of the two syndicates overlapped. *See id*. The location of the conspiracies is also of little value because both syndicates operated on the internet. *See id*.

What drives the court's analysis is that Infraud Organization's conspirators systematically engaged in different overt acts than Carder.su's conspirators. The two syndicates operated their own online discussion forums and engaged in criminal activities through their respective websites. *Id*. This disparity between Carder.su and Infraud Organization's activities has allowed the government to prosecute this case without re-alleging any of the 109 racketeering acts from the Carder.su indictment. *See United States v. Defendant 1 et al.*, No. 2:12-cr-00004-APG-GWF (D. Nev.).

In sum, the RICO conspiracy count in this litigation does not charge Thomas for the same RICO conspiracy offense from the Carder.su prosecution because the two syndicates operated in different time periods, had different leadership, and engaged in different overt acts. Therefore, the government has not placed Thomas in double jeopardy. *See Custer v. Hill*, 378 F.3d 968, 972–73 (9th Cir. 2004) ("the [double jeopardy] clause does not protect against prosecution for two different offenses").

   b. *Successive prosecution*

Thomas argues in the alternative that prosecuting criminal conduct which had a nexus to the Carder.su prosecution violates the Due Process Clause of the Fifth Amendment because

**James C. Mahan**
**U.S. District Judge**

successive prosecutions wear down defendants and place them in weaker bargaining positions. (ECF No. 467). Thomas cites *United States v. Scott*, 437 U.S. 82, 91 (1978) and *Green v. United States*, 355 U.S. 184, 187–88 (1957) in support of his contention. *Id*. However, the relevant portions of these opinions discuss the constitutional prohibition against multiple prosecutions for the *same* offense under the Double Jeopardy Clause. *See Scott*, 437 U.S. at 91; *see also Green*, 355 U.S. at 187-88.

The court reminds Thomas that due process prohibits procedures that tend to "shock the sense of fair play." *Howard v. United States*, 372 F.2d 294, 301 (9th Cir. 1967) (citing *Galvan v. Press*, 347 U.S. 522 (1954)). Here, the government has merely initiated a second prosecution for a second RICO conspiracy offense. (ECF Nos. 467, 504). Such circumstances do not shock the sense of fair play and do not violate the Due Process Clause. *See Sanchez v. United States*, 341 F.2d 225, 229 (9th Cir. 1965) ("there is no authority for the proposition that an accused is denied due process when nothing more appears than two successive prosecutions for separate offenses").

### ii. Leopard's motion to dismiss

Leopard argues that the court should dismiss the second superseding indictment on two grounds: (1) the prior conviction in Macedonia bars a second prosecution in the United States pursuant to the Double Jeopardy Clause and (2) the court does not have jurisdiction over Leopard's extraterritorial activities. (ECF No. 468).

#### a. Separate sovereign doctrine

The Double Jeopardy Clause's protection against successive prosecutions and multiple punishments is not absolute. The separate sovereign doctrine allows two sovereigns to initiate successive prosecutions against an individual for the same conduct. *United States v. Enas*, 255 F.3d 662, 666–67 (9th Cir. 2001) (holding that the Dual Sovereign Clause allows successive prosecutions by separate sovereigns). The Fifth Amendment provides for this exception because a crime is "an offense against the sovereignty of a government." *Enas*, 255 F.3d at 666. "Thus, a single act that violates the laws of two sovereigns constitutes two separate crimes." *Id*.

Governmental entities are separate sovereigns when "the prosecutorial powers of the two jurisdictions have independent origins . . ." *Commonwealth of Puerto Rico v. Sanchez Valle*, 136

S.Ct. 1863, 1867 (2016) (quoting *United States v. Wheeler*, 435 U.S. 313, 320 (1978)).  Foreign nations are archetypal examples of such entities so long as they do not initiate criminal proceedings as "a cover for what is in essence a federal prosecution."  *United States v. Richardson*, 580 F.2d 946, 947 (9th Cir. 1978) (holding that a federal prosecution succeeding a Guatemalan prosecution did not place defendants in double jeopardy).

Macedonia, a foreign nation, initiated the prior prosecution of Leopard.  (ECF Nos. 468, 502).  Nothing in the record indicates that Macedonia was acting as an agent of the United States or that the Macedonian prosecution was a cover for a federal prosecution.  Therefore, Macedonia was acting as a separate sovereign within the meaning of the Fifth Amendment.  Double jeopardy does not apply to this kind of foreign criminal proceeding.  *See Chua Han Mow v. United States*, 730 F.2d 1308, 1313 (9th Cir. 1984) (holding that a conviction in Malaysia did not bar prosecution for the same offense in the United States).

The court also notes that Leopard is not in double jeopardy because the Macedonian court did not convict Leopard for the same offense that the government has charged in this case.  When two offenses arise from different statutory provisions, as is the case here, courts must use the *Blockburger* test to determine whether double jeopardy applies.  *United States v. Kimbrew*, 406 F.3d 1149, 1151–52 (9th Cir. 2005).  Under this test, courts consider whether each offense requires proof of an element that the other does not.  *United States v. Dixon*, 509 U.S. 688, 696 (1993) (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).

The RICO conspiracy count in this case, unlike the making and using fake payment cards offense from the Macedonian case, requires the government to prove that Leopard *conspired* to commit a pattern of racketeering activity.  18 U.S.C. § 1962(d).  Absent any element for entering into an agreement to commit unlawful activities, the Macedonian offense is actually an overt racketeering act.  *See* 18 U.S.C. § 1961(1).  It is well-established that RICO conspiracy and underlying predicate acts are separate offenses for double jeopardy purposes.  *United States v. Luong*, 393 F.3d 913, 915–16 (9th Cir. 2004).

      *b.  Extraterritorial application*

Leopard argues that the court should dismiss the RICO conspiracy charge because the government improperly alleges an extraterritorial application of the RICO statute. (ECF No. 468). The court disagrees.

Unless Congress has clearly expressed otherwise, federal laws have only domestic application. *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). This presumption arises from the "commonsense notion that Congress generally legislates with domestic concerns in mind." *Smith v. United States*, 507 U.S. 197, 204 n.5 (1993). Thus, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Morrison*, 561 U.S. at 255.

In *RJR Nabisco*, the Supreme Court created a two-step framework for analyzing the extraterritorial application of statutes. *RJR Nabisco, Inc. v. European Community*, 136 S.Ct. 2090, 2101 (2016). First, courts ask "whether the statute gives clear, affirmative indication that it applies extraterritorially." *Id.* Second, if the statute does not apply extraterritorially, then courts must determine whether the case involves a domestic application of the statute by looking at conduct relevant to the statute's focus. *Id.*

The offense at issue is RICO conspiracy in violation of 18 U.S.C. § 1962(d). (ECF Nos. 303, 468). The extraterritorial reach of § 1962(d) is commensurate with that of the conspiracy's underlying predicate acts. *See RJR Nabisco*, 136 S.Ct. at 2103 ("we assume without deciding that § 1962(d)'s extraterritoriality tracks that of the provision underlying the alleged conspiracy"). The government alleges in the second superseding indictment 117 predicate acts which collectively violated the following statutes: 18 U.S.C. § 1028, 18 U.S.C 1029, 18 U.S.C. § 1343, 18 U.S.C. § 1344, and 18 U.S.C. § 1543. (ECF No. 303).

The respective statutes for the predicate acts do not contain any indication that they apply extraterritorially. *See* 18 U.S.C. §§ 1028, 1029, 1343, 1344, and 1543. To be sure, some of the statutes expressly prohibit acts that affect foreign commerce. *See* 18 U.S.C. §§ 1028, 1029, 1343. However, "a general reference to foreign commerce in the definition of 'interstate commerce' . . . does not defeat the presumption against extraterritoriality." *Morrison*, 561 U.S. at 263; *see, e.g.*, *United States v. Hussain*, No. 16-cr-00463-CRB-1, 2017 WL 4865562 at *2 (N.D. Cal. Oct. 27,

2017). Therefore, because the relevant provisions do not apply extraterritorially, the court proceeds to the second step.

An action involves a domestic application of the RICO statute if the indictment contains allegations of a domestic injury. *See RJR Nabisco*, 136 S.Ct. at 2111; *see also United States v. Chao Fan Xu*, 706 F.3d 965, 979 (9th Cir. 2013). Here, the government alleges that the defendants conspired throughout the world, including the District of Nevada, and engaged in activities that affected interstate commerce. (ECF No. 303). The government also identifies in the second superseding indictment several American financial institutions that Infraud Organization victimized, such as VISA, MasterCard, American Express, and Discover. *Id*. Because these are allegations of racketeering activities that caused injuries within the United States, this case involves a domestic application of the RICO statute.

### iii. *Leopard, Telusma, Thomas, Chiochiu, Wilson, and Ymeraj's motion to dismiss*

Leopard, Telusma, Thomas, Chiochiu, Wilson, and Ymeraj argue that the court should dismiss the RICO conspiracy charge because it is unconstitutional under the First Amendment. (ECF No. 471). Specifically, they contend that the RICO statute is overbroad and vague, facially and as applied. *Id*.

#### a. *Overbroad under the First Amendment*

A law is facially overbroad if it punishes a substantial amount of free speech relative to the statute's plainly legitimate sweep. *United States v. Kaczynski*, 551 F.3d 1120, 1126 (9th Cir. 2009). Facially overbroad laws are entirely void "unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Virginia v. Hicks*, 539 U.S. 113, 19 (2003). The First Amendment's overbreadth doctrine is "strong medicine" that courts use "only as a last resort." *New York v. Ferber*, 458 U.S. 747, 769 (1982) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)).

The first step in determining whether a statute is overbroad requires courts to "determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Village of Hoffman Estates v. The Flipside Hoffman Estates*, 455 U.S. 489, 494 (1982). Here, the RICO statute prohibits speech in furtherance of criminal activity. *See* 18 U.S.C. § 1961 *et seq*.

James C. Mahan
U.S. District Judge

The First Amendment does not protect this kind of conduct. *United States v. Osinger*, 753 F.3d 939, 946 (9th Cir. 2014) ("the First Amendment . . . allows government to regulate speech integral to criminal conduct"). Therefore, the RICO statute is not facially overbroad. *Alexander v. United States*, 509 U.S. 544, 555 (1993).

For the as applied challenge to succeed, the RICO statute must be unconstitutional as applied to the litigants' particular speech activity. *Kaczynski*, 551 F.3d at 1126. Specifically, Leopard, Telusma, Thomas, Chiochiu, Wilson, and Ymeraj must show that the RICO conspiracy count improperly suppresses their right to "free expression." *Id.* at 1127. This constitutional right, however, is not unlimited. The First Amendment does not protect "obscenity, defamation, fraud, incitement, and speech integral to criminal conduct." *Osinger*, 753 F.3d at 946 (citing *United States v. Meridith*, 685 F.3d 814, 819 (9th Cir. 2012)).

The relevant acts that the government alleges in the second superseding indictment consist of hosting websites or handling website traffic to facilitate the purchase and sale of contraband. (ECF No. 303). Nothing in the second superseding indictment indicates that these websites engaged in any lawful activities, such as news reporting or posting commentary. *See generally id.* Thus, prosecuting Leopard, Telusma, Thomas, Chiochiu, Wilson, and Ymeraj for the use of these websites does not suppress their free expression of ideas. Rather, it is a proper means to hold them liable for criminal activity.

### b. Vague under the First Amendment

Leopard, Telusma, Thomas, Chiochiu, Wilson, and Ymeraj do not identify in their motion why the RICO statute is vague. *See* (ECF No. 471). Instead, they state that this case involves First Amendment freedoms and generally remark that § 1962(d) is unconstitutional on its face and as applied. *Id.* The reply is similarly deficient as it concludes without providing any justification that the definitions of "conduct," "enterprise," and "pattern of racketeering activity" encourage arbitrary arrests and convictions. (ECF No. 519). Without more particularized grounds for dismissal, the court can do little to adjudicate this issue.

The court generally notes that the RICO statute contains extensive definitions and enumerates predicate acts that can constitute a pattern of racketeering activity. 18 U.S.C. § 1961

*et seq.* This statutory scheme provides "a person of ordinary intelligence fair notice of what is prohibited" and discourages "seriously discriminatory enforcement." *Harris*, 705 F.3d at 932 (citing *United States v. Kilbride*, 584 F.3d 1240, 1257 (9th Cir. 2009)). Any conduct that falls within the statute's scope, even if it involves expressive acts, constitutes criminal activity. The instant conduct of hosting websites for the purchase and sale of contraband is no exception. *Id.* (holding that a statute is vague as applied if it fails to put defendants on notice).

The motion to dismiss and related briefs lack concrete legal arguments because there does not exist any convincing reason to dismiss the RICO conspiracy count. Indeed, the Ninth Circuit and every other circuit that has considered the constitutionality of the RICO statute has rejected facial and as applied vagueness challenges. *United States v. Mason*, 26 F.3d 134 (9th Cir. 1994) ("Constitutional challenges to this statute have been consistently rejected in a variety of circumstances by the Ninth Circuit and by all other Circuits that have considered this issue."); *see also United States v. Dischner*, 974 F.2d 1502, 1522–23 (9th Cir. 1992). The court will follow this well-established precedent.

### iv. Chiochiu's motion to dismiss

On April 8, 2019, Magistrate Judge Leen granted Leopard and Ymeraj's motions for joinder to Chiochiu's motion to dismiss. (ECF No. 527). Chiochiu argues in his motion that the RICO statute is unconstitutional as applied to his alleged conduct of creating and sharing hostile software. (ECF No. 473). This argument does not pertain to Leopard and Ymeraj because the government does not allege that Leopard and Ymeraj created or shared software. *See* (ECF No. 303). Therefore, the court will vacate the magistrate judge's order and deny Leopard and Ymeraj's motions for joinder.

As for the motion to dismiss, Chiochiu's ground for dismissal is two-fold. First, Chiochiu argues that the First Amendment protects posting source code and programs because such content has legitimate scientific interest to the community of computer scientists, software developers, and the general public. (ECF No. 473). Second, Chiochiu argues that the RICO statute is overbroad as applied to his alleged speech activity. *Id.*

### a. Source code as speech under the First Amendment

James C. Mahan
U.S. District Judge

The First Amendment safeguards the free expression of ideas. *Mabey v. Reagan*, 537 F.2d 1036, 1045–46 (9th Cir. 1976) (citing *Spence v. Washinton*, 418 U.S. 405, 411 (1974)). This protection extends beyond "spoken or written word" so long as the relevant conduct is "sufficiently imbued with elements of communication[.]" *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Source code, object code, and other computer software languages can involve the expression of ideas. *See Sony Computer Entm't v. Connectix Corp.*, 203 F.3d 596, 602 (9th Cir. 2000); *see also Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445–46 (2nd Cir. 2001).

The source codes at issue are for malware that computers read and execute. (ECF Nos. 473, 503). The government primarily argues that Chiochiu's source codes do not contain elements of communication because they are "purely functional, not expressive." (ECF No. 503). Chiochiu contends that the source codes, despite being functional in nature, are speech under the First Amendment by virtue of the information that they convey. (ECF No. 473).

Other courts have dealt with similar constitutional challenges and have held that source code contains elements of communication. For example, in *Bernstein* the district court held that the First Amendment protects source code for an encryption program. *See Bernstein v. United States Dep't of State*, 922 F. Supp. 1426, 1434–36 (N.D. Cal. 1996). The rationale for this holding was that the source code expresses ideas because it communicates to computers how to make the underlying encryption algorithm work. *Id.* at 1436.

The analysis in *Bernstein* applies to the facts in this case. Although Chiochiu's source codes were tools for stealing personal and financial information, they also contained content on how a computer could "gather intelligence for later use in a fraud scheme[.]" (ECF No. 303). Once a computer translates the source codes into object codes, it can follow the source codes' instructions and steal information. *See Sony Computers Entm't*, 203 F.3d at 600. These instructions, by expressing how computers can manipulate other computers that handle billing and credit card data, are speech within the meaning of the First Amendment.

>    *b. The RICO statute's regulation of speech*

To determine whether the RICO statute violates the First Amendment, the court must first determine the appropriate level of scrutiny to apply. The government can implement content-

based regulation of speech only if the regulation serves a compelling state interest in the least restrictive means available. *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 680 (1994) (strict scrutiny). In contrast, content-neutral regulation must serve a substantial government interest unrelated to the suppression of free expression and the restriction of speech must be no greater than necessary to further the government interest. *Id*. at 662 (intermediate scrutiny).

The principal inquiry in determining the applicable level of scrutiny is whether the government has adopted a regulation of speech because of agreement or disagreement with the message it conveys. *Doe v. Harris*, 772 F.3d 563, 574 (9th Cir. 2014) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Here, the RICO statute does not contain any direct regulation of speech. *See* 18 U.S.C. § 1961 *et seq*. The statute also does not reference any specific subject matters or viewpoints. *Id*. Instead, it broadly criminalizes racketeering activity. *See id*. Thus, the RICO statute is content-neutral and intermediate scrutiny applies.

Moving to the substantive analysis of the RICO statute under the Free Speech Clause, the court first recognizes that the "government's interest in preventing crime . . . is both legitimate and compelling." *United States v. Salerno*, 481 U.S. 739, 749 (1987) (citing *De Veau v. Braisted*, 363 U.S. 144, 155 (1960)). The RICO statute furthers this interest by creating a powerful legal basis to convict individuals involved in organized crime. *See* 18 U.S.C. § 1961 *et seq*. Chiochiu's alleged conduct, which involved conspiring with other Infraud Organization members to commit racketeering activity, falls within the kind of conduct that the government has a compelling interest to prevent.

The only speech activity that the RICO statute incidentally prohibits is speech that occurs in furtherance of racketeering activity. *See id*. Chiochiu's alleged speech is precisely of this sort. According to the government, Chiochiu directly facilitated criminal activity by posting on the Infraud website malware that co-conspirators used to break into computers and steal data. (ECF No. 303). Because the First Amendment does not protect this kind of speech, the RICO statute does not burden the right to free expression. *See United States v. Stevens*, 559 U.S. 460, 468 (2010) (holding that the First Amendment does not protect "speech integral to criminal conduct"). Therefore, the RICO statute withstands intermediate scrutiny as applied to Chiochiu.

*v.   Telusma, Thomas, Ymeraj, and Leopard's motion to dismiss*

On April 11, 2019, Magistrate Judge Leen granted Thomas, Chiochiu, Wilson, Ymeraj, and Leopard's motions for joinder to Telusma's motion to dismiss.  (ECF No. 533).  Telusma argues in his motion that the government has failed to state an offense for RICO conspiracy because (1) vendors do not conduct the affairs of Infraud Organization and (2) vendors were not part of Infraud Organization.  (ECF No. 476).  These arguments do not pertain to Chiochiu and Wilson because the government does not allege that they were vendors.  *See* (ECF No. 303). Therefore, the court will vacate the magistrate judge's order as it pertains to Chiochiu and Wilson and deny Chiochiu and Wilson's motions for joinder.

As a second preliminary matter, Telusma has filed a motion for leave to file reply in support of his objection to the magistrate judge's report and recommendation.  (ECF No. 562). The motion includes Telusma's proposed reply, which repackages and further elaborates arguments that Telusma has raised in previous filings.  *See* (ECF Nos. 476, 509, 550).  This is nothing more than an "improper attempt to have the last word on an issue . . ."  *Smith v. United States,* No. 2:13-cv-039-JAD-GWF, 2014 WL 1301357 at *5 (D. Nev. Mar. 28, 2014).  In the interest of fairness and judicial economy, the court will deny Telusma's motion for leave to file reply.  *See* LR IB 3-2(a) (providing that courts have discretion in granting leave to file reply).

The court now adjudicates the merits of Telusma, Thomas, Ymeraj, and Leopard's motion to dismiss.  The four defendants argue that the court should dismiss the first count of the second superseding indictment because the government has failed to state an offense for RICO conspiracy pursuant to Federal Rule of Criminal Procedure 12(b)(3).  (ECF No. 476).  In light of the allegations in the second superseding indictment, the court disagrees.  *See United States v. Boren*, 278 F.3d 911, 913 (9th Cir. 2014) ("In ruling on a pre-trail motion to dismiss an indictment for failure to state an offense, the district court is bound by the four corners of the indictment.").

18 U.S.C. § 1962(d) prohibits any person from conspiring to violate the RICO statute. *Howard v. America Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000).  Subsection (c) provides that it is unlawful for any person associated with an enterprise engaged in interstate or foreign commerce to participate in such an enterprise's affairs through a pattern of racketeering activity.

18 U.S.C. § 1962(c); *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015). A defendant engages in a "pattern of racketeering activity" by committing at least two predicate acts enumerated in § 1961(1). 18 U.S.C. § 1961(5).

An alleged conspirator need not personally engage in an overt act or agree to facilitate each part of the offense. *Salinas v. United States*, 552 U.S. 52, 65 (1997). RICO conspiracy "requires only that the defendant was 'aware of the essential nature and scope of the enterprise and intended to participate in it.'" *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015) (citing *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004)). Nevertheless, a conspiracy claim cannot survive if the government does not plead a substantive RICO violation. *Howard*, 208 F.3d at 751.

Infraud Organization was an association-in-fact enterprise. Every member of the syndicate had a defined role that allowed Infraud Organization to become the premier online destination to sell contraband and enrich its members through illicit activity. *See* (ECF No. 303); *see also United States v. Turkette*, 452 U.S. 576, 583 (1981) (holding that an association-in-fact enterprise under RICO is "a group of persons associated together for a common purpose of engaging in a course of conduct."). The members facilitated the syndicate's common purpose by relying on a hierarchy and rules of conduct to function as a continuing unit over several years. *See* (ECF No. 303); *see also Boyle v. United States*, 556 U.S. 938, 946 (2009) (holding that an enterprise must have purpose, relationship among associates, and longevity).

The alleged scale of Infraud Organization entails that it engaged in activities that affected interstate commerce. According to the government, the syndicate had 10,901 members that purchased and sold stolen information by using Infraud Organization's online discussion forum. (ECF No. 303). These activities harmed various financial institutions throughout the United States including banks and credit card companies. *Id.* The second superseding indictment also contains allegations of a co-defendant attempting to sell credit card data that he hacked from Canada. *Id.* Thus, Infraud Organization's alleged activities affected foreign commerce as well.

As for Telusma, Thomas, Ymeraj, and Leopard's conduct, the government need only allege that the defendants "'knowingly agreed to facilitate a scheme which includes the operation or

management of a RICO enterprise.'" *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004) (brackets omitted) (quoting *Smith v. Berg*, 247 F.3d 532, 534 (3rd Cir. 2001)). Such is the case here.

The government alleges that all four defendants joined and thereby agreed to be a part of Infraud Organization between November 2010 and October 2011. (ECF No. 303). Telusma, Thomas, Ymeraj, and Leopard appear to have been well-aware of the syndicate's nature because, based on the allegations in the second superseding indictment, the defendants engaged in several illicit activities involving the purchase and sale of fraud-related products. *Id*. Thomas allegedly provided a look-up service that allowed Infraud Organization members to obtain stolen social security numbers and other personal information. *Id*. Leopard, Ymeraj, and Telusma allegedly sold compromised credit card data. *Id*. These services were integral to the syndicate's operations because they provided other members with the means to launder contraband.

Aside from hosting websites that provided illicit services, Telusma, Thomas, Ymeraj, and Leopard had other alleged roles in their capacities as vendors that facilitated Infraud Organization's scheme. The four defendants drove traffic to the forum, paid administrators for advertisements, and were vetted by Infraud Organization's leadership to ensure that they provided high-quality services and goods. *Id*.

The court notes that the second superseding indictment does not contain allegations of an express agreement. *See id*. However, an "illegal agreement need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 775 (9th Cir. 2002). Telusma, Thomas, Ymeraj, and Leopard's alleged activities show that there was an agreement because they relied on Infraud Organization's website, hierarchy, and rules of conduct to enrich themselves. (ECF No. 303). Infraud Organization similarly relied on these four defendants to establish itself as the premier destination for fraud-related contraband. *Id*.

In sum, the government has sufficiently pleaded that Telusma, Thomas, Ymeraj, and Leopard knowingly agreed to facilitate Infraud Organization's scheme. The second superseding indictment alleges that the four defendants joined Infraud Organization and committed various

overt acts. *Id*. This is enough to attach criminal liability. *See Christensen*, 828 F.3d at 781 ("[t]he RICO net is woven tightly to trap even the smallest fish . . ."). Further, the government has alleged a pattern of racketeering activity in violation of § 1962(c) by identifying 117 predicate offenses that Infraud Organization members committed. *See Howard*, 208 F.3d at 751 ("failure to allege substantive violations precludes . . . a [RICO] conspiracy").

### B. Motions to suppress

Two motions to suppress are pending before the court. (ECF Nos. 474, 475). First, the court will deny Chiochiu's motion to suppress because the Chiochiu warrant's affidavit established probable cause. Second, the court will deny Telusma's motion because the Telusma warrants' scopes did not exceed the probable cause on which they were based and identified items subject to seizure with sufficient particularity.

### i. Chiochiu warrant

Chiochiu argues that the affidavit in support of the warrant to search the Borghese property did not establish probable cause because the affidavit did not show that there was a fair probability that (1) Chiochiu possessed the items that the government seized and (2) the items were located at the Borghese property. (ECF No. 474).

The Fourth Amendment provides that "no Warrants shall issue but upon probable cause[.]" U.S. Const. amend. IV (comma omitted); *United States v. Artis*, 919 F.3d 1123 (9th Cir. 2019). Probable cause exists "if an affidavit presents a 'fair probability' that evidence of criminal activity will be found in the place to be searched." *United States v. Flores*, 802 F.3d 1028, 1043 (9th Cir. 2015) (citation omitted). The issuing judge need not determine the actual location of the evidence, but only that it would be reasonable to seek evidence in the place that the affiant indicates. *United States v. Elmore*, 917 F.3d 1068, 1074 (9th Cir. 2019).

Courts give "great deference" to an issuing judge's determination of probable cause. *United States v. Grant*, 682 F.3d 827, 832 (9th Cir. 2012). Nevertheless, a court may reject such a determination if it "reflected an improper analysis of the totality of the circumstances." *Elmore*, 917 F.3d at 1074 (quoting *United States v. Leon*, 468 U.S. 897, 915 (1984)). Such a situation

arises when an affidavit does not recite facts that allow a magistrate judge to draw reasonable inferences. *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013).

The affidavit to the search warrant for the Borghese property contains approximately thirty pages of facts. (ECF No. 474-1). Most notably, the affiant explains that sophisticated software developers like Chiochiu store prior work for safekeeping so they can efficiently write new programs that address similar coding problems. *Id*. Chiochiu did not turn over his library of prior works. *Id*. Instead, he provided the government with a hard drive that at some point contained malware that steals personal and financial information. *Id*. The day before Chiochiu turned over this hard drive, he surgically wiped the malware program but left personal files on the device so that law enforcement officials would not notice that data were missing. *Id*.

These facts indicate with a strong degree of probability that Chiochiu retained his library of prior works because he did not turn over the library and actively concealed possession of a program that he allegedly used to commit fraud. Needless to say, the library would likely include highly probative evidence of Chiochiu's illicit activities as a member of Infraud Organization. Therefore, Magistrate Judge Spaeth made a "practical, common sense decision" when she concluded that there is a fair probability that Chiochiu possessed "contraband or evidence of a crime[.]" *United States v. Krupa*, 658 F.3d 1174, 1177 (9th Cir. 2011)

As for the location to be searched, the affiant explains that a library of prior works would be stored on digital devices and Chiochiu would likely keep such devices at his place of residence. (ECF No. 474-1). The affiant's conclusion was sensible because it would be dangerous for Chiochiu to keep such devices in a location that he did not control. Moreover, Chiochiu confirmed that these devices were at his place of residence when he provided law enforcement officials with a home address at which he did not actually live. *See id*. Nothing in the affidavit supports any other explanation for this act of deception. *See id*.

Finally, law enforcement officials discovered that Chiochiu was at the Borghese property with his wife when they observed him taking out the trash. *Id*. This evidence allowed Magistrate Judge Spaeth to properly determine that Chiochiu resided at the Burghese property and that there was a fair probability that he placed at the residence devices containing incriminating evidence.

*See Elmore*, 917 F.3d at 1074 ("the issuing judge need only conclude that it would be reasonable to seek evidence in the placed indicated in the affidavit"). The court finds no reason to disturb the magistrate judge's conclusion.

### ii. *Telusma warrants*

Telusma argues that (1) the search warrants for the Brooklyn property are overbroad because the underlying affidavit did not establish probable cause to seize his iPhones and (2) the search warrants did not particularly describe that the government could seize his iPhone 8, iPhone X, iPad, and MacBook Pro. (ECF No. 475).

#### a. *Overbroad warrant*

A warrant is unconstitutionally overbroad when the scope of the warrant exceeds the probable cause on which it is based. *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 702–03 (9th Cir. 2009). If probable cause does not exist to seize the item that the warrant describes, courts invalidate the warrant and suppress evidence arising from the unlawful seizure. *See, e.g.*, *id*. at 703–05. The purpose of this requirement is to prevent "a 'general, exploratory rummaging in a person's belongings.'" *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 857 (9th Cir. 1991) (quoting *Andresen v. Maryland*, 427 U.S. 463, 480 (1976)).

Magistrate Judge Orenstein properly concluded that there was probable cause to seize Telusma's smartphones. The February search warrants' affidavit included an extended recitation of Telusma's membership in Infraud Organization and his corresponding activities. (ECF No. 475-1). As a cybercriminal, Telusma likely possessed and used several digital devices in furtherance of various internet-based illicit activities. Moreover, the government discovered evidence that corroborates this inference when it found Telusma posting images on his Facebook profile depicting several devices including a smartphone. *Id*.

After law enforcement officials entered the Brooklyn property and observed in plain view Telusma's iPhone, they confirmed that he was in possession of another smartphone. (ECF No. 523). The law enforcement officials then obtained a supplemental warrant based on the original affidavit and their observations from their search of the Brooklyn property. *Id*. The supplemental

1   warrant authorized the agents to return to the residence and seize, in addition to the smartphone

2   from the February 5, 2018, warrant, a black iPhone. *Id.*

3          In consideration of the foregoing, it was all but certain that Telusma was in possession of

4   two smartphones. Because Telusma must have used digital devices to commit his crimes, it was

5   reasonable to seize those smartphones as well as any other device on the premises. This includes

6   the iPhone X, which Apple released on November 3, 2017, because iPhones often store historical

7   information that users import from previous devices. Thus, "the totality of the circumstances"

8   support Magistrate Judge Orenstein's determination of probable cause. *Elmore*, 917 F.3d at 1074.

9   The court will afford the magistrate judge the "great deference" to which he is entitled and affirm

10  his conclusion. *Grant*, 682 F.3d at 832,

11         *b.  Particularity*

12         The Fourth Amendment requires that a warrant particularly describe "the place to be

13  searched, and the persons or things to be seized." U.S. Const. amend. IV; *United States v. Brobst*,

14  558 F.3d 982, 993 (9th Cir. 2009). "'The description must be specific enough to enable the person

15  conducting the search reasonably to identify the things authorized to be seized.'" *United States v.*

16  *SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009) (citation omitted). "However, the level

17  of detail necessary in a warrant is related to the particular circumstances and the nature of the

18  evidence sought." *United States v. Adjani*, 452 F.3d 1140, 1147 (9th Cir. 2006).

19         Telusma's contention that the February warrants do not particularly describe that law

20  enforcement officials could seize his smartphones, iPad, and laptop is entirely baseless. The

21  warrants incorporated by reference lists of items that were subject to seizure. (ECF No. 523); *see*

22  *also SDI Future Health*, 568 F.3d at 700 (holding that a warrant can incorporate an affidavit). The

23  items in those lists included "an iPad, a smartphone, a MacBook Pro" and "a black iPhone." (ECF

24  No. 523) (includes grammatical alterations). To require further specificity would enlarge the

25  Fourth Amendment's protections to a point of absurdity.

26  **VI.     Conclusion**

27

28

The court will deny all motions (ECF Nos. 467, 468, 471, 473, 474, 475, 476, 562) and adopt all of Magistrate Judge Leen's report and recommendations (ECF Nos. 524, 525, 527, 528, 529, 533, 534).

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that Telusma's motion for leave to file reply (ECF No. 562) be, and the same hereby is, DENIED.

IT IS FURTHER ORDERED that Magistrate Judge Leen's report and recommendation (ECF No. 534) be, and the same hereby is, GRANTED, consistent with the foregoing.

IT IS FURTHER ORDERED that Magistrate Judge Leen's report and recommendation (ECF No. 533) be, and the same hereby is, GRANTED, consistent with the foregoing.

IT IS FURTHER ORDERED that Magistrate Judge Leen's April 11, 2019, order granting Thomas, Chiochiu, Wilson, Ymeraj, and Leopard's motions for joinder (ECF No. 533) be, and the same hereby is, VACATED in part, consistent with the foregoing.

IT IS FURTHER ORDERED that Magistrate Judge Leen's report and recommendation (ECF No. 529) be, and the same hereby is, ADOPTED, consistent with the foregoing.

IT IS FURTHER ORDERED that Magistrate Judge Leen's report and recommendation (ECF No. 528) be, and the same hereby is, ADOPTED, consistent with the foregoing.

IT IS FURTHER ORDERED that Magistrate Judge Leen's report and recommendation (ECF No. 527) be, and the same hereby is, ADOPTED, consistent with the foregoing.

IT IS FURTHER ORDERED that Magistrate Judge Leen's April 8, 2019, order granting Leopard and Ymeraj's motions for joinder (ECF No. 527) be, and the same hereby is, VACATED.

IT IS FURTHER ORDERED that Magistrate Judge Leen's report and recommendation (ECF No. 525) be, and the same hereby is, ADOPTED, consistent with the foregoing.

IT IS FURTHER ORDERED that Magistrate Judge Leen's report and recommendation (ECF No. 524) be, and the same hereby is, ADOPTED, consistent with the foregoing.

IT IS FURTHER ORDERED that Leopard's motion for joinder (ECF No. 485) be, and the same hereby is, DENIED.

James C. Mahan
U.S. District Judge

- 26 -

1    IT IS FURTHER ORDERED that Ymeraj's motion for joinder (ECF No. 483) be, and the
2    same hereby is, DENIED.

3    IT IS FURTHER ORDERED that Wilson's motion for joinder (ECF No. 481) be, and the
4    same hereby is, DENIED in part, consistent with the foregoing.

5    IT IS FURTHER ORDERED that Chiochiu motion for joinder (ECF No. 480) be, and the
6    same hereby is, DENIED in part, consistent with the foregoing.

7    IT IS FURTHER ORDERED that Telusma, Thomas, Ymeraj, and Leopard's motion to
8    dismiss (ECF No. 476) be, and the same hereby is, DENIED.

9    IT IS FURTHER ORDERED that Telusma's motion to suppress (ECF No. 475) be, and
10   the same hereby is, DENIED.

11   IT IS FURTHER ORDERED that Chiochiu's motion to suppress (ECF No. 474) be, and
12   the same hereby is, DENIED.

13   IT IS FURTHER ORDERED that Chiochiu's motion to dismiss (ECF No. 473) be, and the
14   same hereby is, DENIED.

15   IT IS FURTHER ORDERED that Leopard, Telusma, Thomas, Chiochiu, Wilson, and
16   Ymeraj's motion to dismiss (ECF No. 471) be, and the same hereby is, DENIED.

17   IT IS FURTHER ORDERED that Leopard's motion to dismiss (ECF No. 468) be, and the
18   same hereby is, DENIED.

19   IT IS FURTHER ORDERED that Thomas' motion to dismiss (ECF No. 467) be, and the
20   same hereby is, DENIED.

21   DATED June 12, 2019.

22
23   _____
     UNITED STATES DISTRICT JUDGE
24
25
26
27
28

James C. Mahan
U.S. District Judge